# EXHIBIT E

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE-OPELOUSAS DIVISION

| MARILYN LEE, ET AL., | : | DOCKET NO. 04-1103 |
|---|---|---|
| Plaintiff, | : | |
| vs. | : | July 15, 2004 |
| WYETH, ET AL., | : | |
| Defendant. | : | Lafayette, Louisiana |

REPORTER'S OFFICIAL TRANSCRIPT OF THE HEARING
BEFORE THE HONORABLE TUCKER L. MELANCON
UNITED STATES DISTRICT JUDGE.

APPEARANCES:

FOR THE PLAINTIFF:          MATTHEW E. LUNDY
                            Attorney at Law
                            333 N. Sam Houston Pkwy. E.
                            Houston, TX  77060

                            BRYAN F. AYLSTOCK
                            Aylstock, Witkin & Sasser
                            55 Baybridge Dr.
                            Gulf Breeze, FL  32561

                            LISA STEWART
                            Attorney at Law
                            333 N. Sam Houston Pkwy. E.
                            Houston, TX  77060

FOR THE DEFENDANT:          DAVID S. NESLIN
                            Arnold & Porter
                            370 Seventeenth St., Ste. 4500
                            Denver, CO  80202-1370

                            KATHLEEN A. MANNING
                            McGlinchey & Stafford
                            P.O. Box 60643
                            New Orleans, LA  70160-0643

REPORTED BY:                LARAE BOURQUE, RPR, CRR
                            United States Court Reporter
                            800 Lafayette Street, Ste. 3103
                            Lafayette, Louisiana  70501



COPY

2

```
 1              P R O C E E D I N G S
 2          THE COURT:  I want to thank y'all for moving it up a
 3    half hour.  The reason y'all were at five o'clock today is
 4    because we were supposed to be in the third day of a six to
 5    eight-week criminal trial, which for reasons y'all don't care
 6    about, there was a severance and the guy pled guilty about two
 7    hours ago.  So that's when we said if you could get here, we'd
 8    appreciate it.
 9          Now, let me say, we are in Civil Action Number 04-1103,
10    Marilyn Lee vs. Wyeth, also known as American Home Products.  The
11    matter was set today on a motion to remand, which is Record
12    Document 8 of this proceeding, and the hearing date was set by
13    Record Document 10.
14          Now, I'd go ahead and ask the lawyers involved in the
15    case, starting with the attorneys for plaintiff, to identify
16    themselves for record purposes.
17          MR. LUNDY:  Matt Lundy with Lundy & Davis on behalf of
18    Marilyn Lee.  And Bryan Aylstock is also here with me, and Lisa
19    Stewart, Your Honor.
20          THE COURT:  All right.
21          MR. NESLIN:  Your Honor, David Neslin with the law firm
22    of Arnold & Porter representing defendant Wyeth.  This is
23    Kathleen Manning.
24          THE COURT:  Thank you.  Now, I have to ask -- and,
25    Mr. Lundy, would you be the spokesperson for the plaintiffs?
```

3

1    MR. LUNDY:  Your Honor, Mr. Aylstock is going to be the

2    spokesperson.

3    THE COURT:  All right.  Mr. Aylstock, if you'll come up

4    here.  I've got just a few questions.  I just kind of want to --

5    I hate to say cut to the chase, but, I mean, this is not the

6    first time this issue -- come on up here.  This is not the first

7    time this issue has been presented to a United States District

8    Judge, is it?

9    MR. AYLSTOCK:  It is not, Your Honor, but I would

10    submit to the Court that this is the first time evidence of the

11    nature that will be presented here has ever been reviewed by a

12    United States District Judge.

13    THE COURT:  Well, when you're talking about evidence,

14    what do you mean?  What are you going to tell me today?

15    MR. AYLSTOCK:  I'm going to tell you that the

16    affidavits that have been presented are untrue, and, in fact,

17    that under the Fifth Circuit standard, that -- and the standard

18    of what it takes to have a colorable claim under Louisiana law,

19    we have met that burden and remand is due to be granted.

20    THE COURT:  Well, help me.  What about it is untrue,

21    that unless you do the -- if I understand correctly, these drug

22    reps who -- again, I thought Judge Minaldi did a great job in her

23    case talking about how under Louisiana law, a drug rep -- what

24    the responsibilities and obligations of a drug rep can be.

25    What's different about this case?

1    MR. AYLSTOCK:  What's different about this case, Your

2    Honor, is that under Louisiana law -- and I'm sure you've read

3    the report and recommendation that has been relied upon by Wyeth.

4    And what's different, number one, is the McKee case has

5    come out since then, and it really removed any doubt about what

6    the standard is under Fifth Circuit law about whether affidavits

7    like this that merely traverse the allegations of the complaint

8    can be considered by the court, and, furthermore, what standard

9    this court needs to apply when such affidavits are considered.

10    THE COURT:  Well, I'm a little confused, and you may

11    have to just educate me, but the idea being that the -- as to

12    your having a case against the reps and having a reasonable

13    possibility of recovery against those reps, help me how you've --

14    MR. AYLSTOCK:  Well, what we intend to prove at trial,

15    Your Honor -- and, again, discovery has not commenced in this

16    case.

17    But what we have proven in other cases -- I've deposed

18    about four different sales representatives over the last three or

19    four weeks, Your Honor.

20    And in every one of those depositions, I'll represent

21    to this Court the sales rep admitted to doing things that were

22    outside the product labeling, and, in fact, promoting the drug in

23    an off-label manner that was illegal and is illegal under the

24    Code of Federal Regulations, and in so doing, asking the doctor

25    to rely upon that, which the doctor did, those misrepresentations

1    and those off-label promotions, which caused our clients to

2    become injured, which is exactly what we've alleged in this case,

3    Your Honor.

4    　　　　THE COURT:   And what you're saying to me is, Judge,

5    even though it's been decided -- or this issue, very issue, about

6    the drug rep, it has been considered in numerous cases across

7    this country, and most recently with Judge Minaldi over in Lake

8    Charles as far as the sake of our discussion today, that now we

9    know in this case something that none of those other judges were

10   presented with.

11   　　　　MR. AYLSTOCK:   Well, let me make sure the record --

12   　　　　THE COURT:   Or am I wrong?

13   　　　　MR. AYLSTOCK:   You're wrong, Your Honor, in this sense.

14   　　　　In Alabama, for example, there have been more than 44

15   motions to remand that have been ruled upon by the entirety

16   nearly of the Alabama judiciary.   In every one of those cases,

17   every single one that was a drug case, remand was granted based

18   upon factually -- in fact, identical affidavits that are

19   presented here.

20   　　　　So I don't want this Court to be under the

21   misapprehension that somehow this is a new and novel theory and

22   that federal district judges throughout this country have somehow

23   uniformly determined that sales representatives cannot be liable.

24   That's not the case; in fact, the opposite of true.

25   　　　　THE COURT:   Help me about -- and I don't know what the

1   law in Alabama is or what they considered, but I understand what

2   the law is and how it will work in Louisiana.  Is there a

3   different standard there to your officer-of-the-court knowledge

4   or not?

5           MR. AYLSTOCK:  No, Your Honor.  The standard under both

6   laws is we have to allege individual participation in the tort.

7   We cannot, under Alabama law, just like under Louisiana law,

8   simply allege that they're an employee and that they didn't

9   participate in the tort, but as an employee, they're liable.

10  That's not what we're claiming here.

11          What we're claiming here is that the sales

12  representatives in this case were personally involved in the

13  tortious conduct that created harm to our plaintiffs, Ms. Rhodes

14  and Ms. Lee.

15          THE COURT:  And the basis for that allegation and what

16  you're supposed to tell me today to help me understand that being

17  the fact and to send it back to state court is what?

18          MR. AYLSTOCK:  The basis for that statement is, in

19  fact, the depositions of other sales representatives who have

20  given identical affidavits that -- actually I think only one of

21  the two sales representatives have given an affidavit in this

22  case.  Mr. Simoneaux has not provided any testimony whatsoever in

23  this case.  So under Fifth Circuit law, the allegations in the

24  complaint stand as they are against Mr. Simoneaux.

25          But be that as it may, the affidavit that was presented

1    by Ms. Lege in this case is identical to affidavits that were

2    presented across this country that have been found, upon

3    cross-examination by myself and others, to be untrue.

4         THE COURT:  Well, how many of these cases are you doing

5    across our country?

6         MR. AYLSTOCK:  I'm involved in several thousand, Your

7    Honor, my firm is, along with other firms.  I don't pretend to be

8    handling several thousand on my own.

9         THE COURT:  Tell me again what's the difference in this

10   situation and the issue that Judge Minaldi considered.

11        MR. AYLSTOCK:  The difference here, Your Honor, is,

12   number one, the report and recommendation out of Lake Charles was

13   before the McKee case, and the McKee case very clearly set forth

14   what standards this Court must apply when an affidavit is

15   presented that basically says I didn't do it.

16        Furthermore, the issue, as it has been decided in other

17   jurisdictions, some -- in some jurisdictions like Alabama,

18   there's one hundred percent uniformity among the Alabama federal

19   judiciary on the issue of whether Wyeth sales representatives

20   could be held liable in a Fen-Phen case.

21        THE COURT:  And you say Alabama and Louisiana are the

22   same?

23        MR. AYLSTOCK:  It's also the same in Florida law where

24   there have been similar rulings.  There's been rulings out of New

25   Mexico, rulings out of St. Louis.

THE COURT: Well, let me ask you this. With your
extensive involvement in these type cases against this defendant,
would you say -- give me some percentage. How are they breaking
out?

MR. AYLSTOCK: I would say they're breaking about
50/50, Judge.

THE COURT: So we've got --

MR. AYLSTOCK: We have some --

THE COURT: We have a significant number of lame
federal judges one way or another.

MR. AYLSTOCK: What we have, Your Honor, are a
significant number of plaintiff lawyers that do not come forth
with contrary evidence, and the evidence, just like as the
magistrate in Lake Charles found the evidence in those cases, was
uncontroverted about what the sales reps did.

They submitted these form affidavits and the plaintiff
lawyers in those cases were not able to come forward with
contrary evidence.

But what I am proposing to the Court, Your Honor, is
that I have such evidence, and that the self-serving sales rep
affidavit that was presented in this case, if it's at all like
the other ones that were presented in other cases, are false and
should not be considered.

THE COURT: Well, do we have that in this case,
controverted?

9

1     MR. AYLSTOCK:  What I have, Your Honor, are affidavits

2     from physicians -- and I'll be happy to pull them out.  But the

3     same affidavit that's presented in this case was presented -- is

4     being presented all across this country basically saying, I never

5     promoted Pondimin.  I didn't do anything wrong.  I never

6     intentionally did anything wrong, and that's been the pattern for

7     Wyeth in removing these cases.

8          And what I have, Your Honor, and can show to you, are,

9     number one, affidavits from physicians saying that's not right.

10    I was detailed on Pondimin by this sales rep who just testified

11    under oath that he didn't detail on Pondimin.

12         What I also have, Your Honor, are deposition testimony

13    by these sales reps saying, well, my affidavit said I didn't

14    detail -- I didn't detail Pondimin, but I talked about studies

15    that related only to Pondimin, or my affidavit may say that I

16    didn't provide samples of Pondimin or stock bottles of Pondimin,

17    but actually I did.

18         And all we're asking this Court to do is give us a

19    chance to do the discovery in state court and determine that our

20    claims at this juncture are colorable under Louisiana law and

21    that we have met the standard or, more specifically, Wyeth has

22    failed.

23         THE COURT:  You know, if I were inclined -- right now

24    you're not there, frankly.  I just need to let you know that

25    based on what I understand, and I'm subject to change my mind.

1         But if I were going to let any discovery go on right

2  now, why wouldn't I just reserve ruling on this motion to remand

3  and not worry about all of that and figure out which 50 percent

4  of the federal judges are lame, or figure out why you say this is

5  different under that Fifth Circuit case since Judge Minaldi made

6  what I thought was a pretty great opinion?  I mean, why wouldn't

7  I just do that?  You can do the discovery here, right?  Discovery

8  is discovery, right?

9         MR. AYLSTOCK:  Well, first of all, Judge, at the very

10  least, that's what we should be permitted to do.  Second of all,

11  Judge, if I may approach and provide you with the McKee case,

12  binding Fifth Circuit precedent from this year, that's not what

13  is required under the Fifth Circuit precedent on ruling on a

14  motion to remand.

15         THE COURT:  The plaintiff says, gee, Judge, we're going

16  to be able to show it, but we need to do some more discovery, and

17  I said, well, wait, I think you don't belong here, but I think

18  what I'll do, I'll just stay this right now in case you're right

19  and then I'll send it back to you.

20         MR. LUNDY:  We agree to that, Your Honor.

21         MR. AYLSTOCK:  We would agree to that.  I mean, that

22  is, in fact, what we're asking, and if it's anything like what

23  has happened in other cases, we will be back before this Court

24  and we will be asking for a remand.

25         The problem that we're faced with is, in fact, what

1  will happen is there will be a conditional transfer order in this

2  case unless it can be done in a very -- the entirety of the

3  discovery with regard to the physicians, with regard to the sales

4  reps and so forth, can be done in a very short manner.  It may be

5  that the case is transferred to another jurisdiction.

6      THE COURT:  Let me ask you this.  Suppose I say to you,

7  you know, I'm denying the motion for remand today.  Let's don't

8  get to that discovery.  And let's suppose we have a conditional

9  transfer and you are aggrieved by my ruling.  What do you do

10  about it then once you transfer it out?

11      MR. AYLSTOCK:  It will then be moved to the Eastern

12  District of Pennsylvania.

13      THE COURT:  And they will make the decision that

14  Melancon got it wrong here.

15      MR. AYLSTOCK:  That would be what I would be arguing to

16  the court, and if it didn't succeed in that court, I would be

17  arguing it to the Third Circuit.

18      THE COURT:  And they have had the opportunity, have

19  they not, on numerous occasions to listen to that exact argument

20  that some plaintiff from some other place made that the district

21  judge erred?

22      MR. AYLSTOCK:  The Eastern District of Pennsylvania has

23  addressed it before in other jurisdictions.  I'm not -- and they

24  very well may address it here in Louisiana.

25      What's different, though, Your Honor, is, number one,

12

1   the allegations in the complaint control, and that's made clear

2   by the McKee case. The Fifth Circuit in McKee said that merely

3   to traverse the allegations of the complaint with an affidavit

4   and then removing a case is not sufficient to sustain a

5   defendant's burden of proving federal court jurisdiction. And

6   that is found on Page 335 of the McKee decision.

7           And what we're here about are two things, Your Honor.

8   We have two resident defendants. We have Michael Simoneaux.

9   Michael Simoneaux is a defendant who was served in this case --

10  and just so the Court isn't under any misunderstanding based upon

11  what Wyeth represented to the Court in their motion or their

12  response to remand, Michael Simoneaux is here. He's a Louisiana

13  resident. He lives in Lafayette.

14          He has been served in this case. He has not submitted

15  one affidavit. There's not one shred of evidence to contradict

16  our allegations against Michael Simoneaux, which under the Fifth

17  Circuit precedent, the Supreme Court precedent, any precedent,

18  means that we get a remand. There's no contrary evidence of

19  Mr. Simoneaux.

20          What Wyeth represented to the Court just a few days

21  ago -- I think it was July 7th -- was that he couldn't be found

22  and that's why there was no affidavit. Well, that's interesting

23  because they answered on behalf of him back in May. So either

24  they answered without his consent, or they know where he is and

25  he hasn't submitted an affidavit.

1    That in and of itself, under Fifth Circuit precedent,

2    requires this Court to remand the case.  That makes it different

3    from the Lake Charles case, Your Honor, because in that case

4    there were affidavits presented by the sales representatives.

5    What's also different is the Lake Charles case was

6    decided before McKee, and what McKee said were several things.

7    One, as I mentioned, the defendants can't simply do an affidavit

8    saying, I didn't do it, merely traverse the allegations of the

9    complaint and succeed.

10    The other thing McKee made clear is that the Court must

11    take into account the status of discovery when it makes such --

12    when it allows any evidence to pierce the pleadings.

13    If the Court is not going to -- if the Court is going

14    to consider the affidavit of Ms. Lege -- as I said, there's none

15    from Mr. Simoneaux here -- then, in fact, the Court must consider

16    the fact that we haven't had an opportunity to do any discovery

17    and must remand the case.  This discovery will proceed in state

18    court.  And if, in fact, we can't support it, then a motion for

19    summary judgment will be granted.

20    But I would submit, based upon the affidavits that were

21    done in other cases, we have uniformly been able to prove them to

22    be untrue and they've admitted as such in their depositions.

23    That's why we're asking you to remand this case, Judge.

24    THE COURT:  All right.  What have you got to say?

25    MR. NESLIN:  Your Honor, you're exactly right.  Under

1    the Westbrook case, this case should be -- the plaintiff's motion

2    for remand should be denied.

3        What Westbrook says is that allegations of the sort

4    that have been brought here, regardless of what -- and I'll talk

5    about the affidavits and declarations and causation issue in a

6    minute.

7        But allegations like those brought here, that the

8    plaintiff has breached a personal duty -- or that the sales rep

9    has breached a personal duty to the plaintiff, don't state a

10   cause of action because the sales rep's only duty is to forward

11   and explain the warning provided by the drug manufacturer.

12       THE COURT:  That's the drug package inserts.

13       MR. NESLIN:  Correct.  That's the footnote in Judge

14   Minaldi's decision talking about that negativing any possibility

15   of recovery against the detailer, the sales rep, and the same is

16   true here.

17       Plaintiff's claim here is not that the sales rep didn't

18   forward the package insert to the doctor.  It's that plaintiffs

19   believe that the package insert was deficient.  Well, any

20   deficiency with the package insert, it may create a cause of

21   action for them against Wyeth.  It doesn't create a cause of

22   action for them against the detailers.

23       That was the holding of Judge Minaldi in the Westbrook

24   decision.  That was the holding of the Louisiana courts in the

25   Catalanotto and Miller decisions that we cited in our papers.

1    And, Judge, we would submit it's just common sense.
2  These drug warnings are prepared by scientists and doctors.  They
3  reflect substantial technical expertise and work.  They have to
4  be submitted to and approved by the FDA.  It would be
5  nonsensical.  It would be dangerous to require sales reps to
6  modify or supersede those warnings with their own unqualified
7  opinions.  So they've stated no claim.  They can state no claim.
8  This case is just like Westbrook in that regard.
9    Now, they've come up with some new arguments here for
10  purposes of oral argument about the second issue, the causation
11  issue, which Judge Minaldi also relied upon.  There are
12  essentially alternative bases of finding fraudulent joinder.  We
13  believe that the plaintiffs cannot show causation here either.
14    There is a declaration from Ms. Lege, one of the
15  detailers.  We have been unable to locate Mr. Simoneaux, the
16  other detailer, but we're confident that if and when he can be
17  located, he will submit a similar declaration.
18    In any event, we submitted sworn testimony by Wyeth
19  executives, sworn testimony from depositions, in which they've
20  stated on the record Wyeth did not promote Pondimin.  Wyeth
21  detailers did not promote Pondimin.  They received no credit for
22  Pondimin.  They weren't paid for Pondimin.  They weren't
23  instructed to promote Pondimin and they didn't promote Pondimin.
24    THE COURT:  So if they're out there doing it, they're
25  just doing it for the heck of it.

16

1          MR. NESLIN:  We don't believe it was done.

2          THE COURT:  But if they were, it was for the heck of

3     it.  It wasn't for any financial award.

4          MR. NESLIN:  Correct.  It would have to have been --

5     that's correct, Your Honor.

6          THE COURT:  And what about this argument about this

7     intervening Fifth Circuit that makes Judge Minaldi's case all wet

8     or something like that?

9          MR. NESLIN:  Well, Your Honor, they haven't cited the

10    McKee case in their papers.  I want to take a look at the McKee

11    case.  I would simply note the declaration by Ms. Lege does not

12    simply traverse the allegations of the complaint.  It's not

13    simply a conclusory negation of liability.

14          She explains she had no role in the development of this

15    drug, in the marketing of this drug.  She didn't provide samples

16    of the drug to detailers.  She wasn't -- she received no

17    compensation for the drug.  That's all in the declaration.  So I

18    think whatever McKee says is not going to be on point here.

19          The same issue -- and this also pertains to the

20    Simoneaux issue.  This same issue was addressed by the MDL Court

21    in Pretrial Order 2886 which we attached as one of the exhibits

22    to our opposition.

23          That was a very similar situation, Your Honor.  There

24    were nine detailers in that case.  Only eight of them submitted

25    affidavits.  One of them couldn't be found.  Wyeth also

1    submitted, however, sworn testimony from Wyeth officials that

2    Wyeth did not -- Wyeth detailers did not promote Pondimin.  Judge

3    Bartle found that those detailers were fraudulently joined,

4    including the detailer who had not submitted a declaration.

5         THE COURT:  Well, let me ask you, why are all of my

6    colleagues over in Alabama not seeing the wisdom of what you've

7    just said if I believe what Mr. Aylstock said, that, you know,

8    universally they've come down and said, no, we send them back to

9    state court?  What's the deal over there?

10        MR. NESLIN:  Your Honor, I'm not familiar with the

11   cases Mr. Aylstock is talking about.  I would say in terms of the

12   break of the cases, how many are being remanded and how many

13   remands are being denied, the great majority of them have been

14   denied during the past year.

15        THE COURT:  Well, that was my impression coming in here

16   today, but he tells me over in Alabama this is slam dunk, not to

17   use that term too lightly anymore.

18        MR. NESLIN:  Well, we would disagree with that, Your

19   Honor.  The MDL Court itself has issued a number of rulings

20   dealing with sales representatives, rulings very similar

21   involving very similar facts like 2886 as I mentioned, a ruling

22   as recent as last -- last week.  And I should -- I brought copies

23   of that.  May I approach the Court?

24        THE COURT:  Yes, you can.  And give a copy to

25   Mr. Aylstock.

1          MR. NESLIN:  This is a recent pretrial order finding a
2   number of detailers were fraudulently joined in Texas.  Your
3   Honor, here's a decision that came out just yesterday -- excuse
4   me -- two days ago in Arkansas.  The reasoning is remarkably
5   similar to Judge Minaldi's reasoning.
6          Among the things the court holds are that under
7   Arkansas law, detailers can have no liability unless it's for not
8   passing on the package insert.  Arkansas law imposes no
9   obligation or duty on detailers to second-guess the warnings that
10  have been created by the diet drug manufacturer.  That's the
11  Hobbs case.  As I say, it just came out two days ago.
12         We attached simply a representative sample of cases
13  during the past year, Your Honor, from Texas, Georgia, Florida, I
14  believe other courts as well, reaching similar rulings on the
15  sales representative issues.
16         So I would submit that the vast majority of the
17  precedent during the past year would support denying the remand
18  motion here and finding the detailers fraudulently joined.
19         The other thing I would note is plaintiffs, should they
20  choose, can always reraise this issue with the -- or could
21  potentially reraise this issue with the MDL Court.  We'd earlier
22  suggested that the Court stay action on this and defer to the MDL
23  Court, because the MDL judge has said these raise common issues,
24  common issues about what detailers did, what products they
25  detailed, and he's developed expertise on this issue and would

1    like to decide them in a uniform fashion.

2         THE COURT:  But isn't it your impression that the

3    district judge that gets the case that has a motion to remand and

4    motion to stay, I ought to go ahead and take care of the remand?

5    Isn't that the way it's supposed to work?

6         MR. NESLIN:  Your Honor, I would agree if the case

7    doesn't involve common issues that are likely to arise in these

8    other MDL cases.

9         I think the whole purpose of the MDL process, I would

10   submit, is to allow for a common and uniform approach on common

11   issues, and I think the diet drug cases are unusual just given

12   the prevalence of the fraudulent joinder issue in this

13   litigation.  There have been dozens of opinions issued by the MDL

14   Court addressing all facets of fraudulent joinder.

15        THE COURT:  But, again, my point, though, if I resolve

16   this thing and it goes in your favor, then the relief to the

17   plaintiff is that Judge Bartle or whoever else over there who's

18   got all this expertise, the database can spit out whatever they

19   spit out and they can take care of that, right?

20        MR. NESLIN:  Yes, Your Honor.

21        THE COURT:  And if I resolve it in the plaintiff's

22   favor, then you go back to state court for more discovery, and

23   then, again, after you do your discovery here and everything your

24   affidavit says, and whatever you're going to file comes through

25   after the deposition testimony, then if you need to try to get

1  back in federal court, you have the opportunity to do that?

2      MR. NESLIN:  I don't think so, Your Honor.  I've got

3  two concerns with the scenario you're suggesting.  First, I think

4  it would be inappropriate to remand on the basis -- or with the

5  expectation that the plaintiff will be able to develop facts to

6  support their claim.

7      The remand issue has to be decided on the papers as

8  they've been submitted to the Judge, to the Court at this point,

9  and if the plaintiffs have not shown a reasonable possibility of

10 prevailing on their merits against the sales reps, then the

11 appropriate action is to deny remand.

12      THE COURT:  So if they're going to fail on Louisiana

13 law, it really doesn't matter what the intervening Fifth Circuit

14 case said, even though you really haven't had a chance to study

15 it.

16      MR. NESLIN:  Correct, Your Honor.  I think we've got an

17 answer for the intervening Fifth Circuit case, but I would agree

18 that it doesn't matter.

19      THE COURT:  All right.  Well, I want you to have the

20 opportunity to read that case and I want to have the opportunity

21 to look at it right quickly before I go any further.  So if

22 you've got those for us, Mr. Aylstock, you can just give it to

23 us.

24      MR. AYLSTOCK:  Okay, Your Honor.  Thank you.

25      MR. NESLIN:  Your Honor, the only other point I did

```
 1    want to make about remanding to the -- remanding the case so that
 2    the plaintiff could pursue discovery in state court, it may pose
 3    an obstacle for us removing subsequently because you have to
 4    remove within 30 days of the time that a paper establishes that
 5    you have adequate grounds to remove.  We believe --
 6              THE COURT:  What about that fallback position, as I
 7    believe is what it is, and say, well, Judge, you just keep the
 8    thing here and we'll do the discovery here?  We don't like it as
 9    well, but we're going to show you at the end the day anyhow.
10    What about that?
11              MR. NESLIN:  I believe that the case should be -- that
12    the motion should be denied on the papers.
13              THE COURT:  Yeah.  But what about the fallback, since I
14    can -- well, I can't do anything I want, but do a heck of a lot
15    of what I want, and say I'm going to defer ruling on the remand
16    and I'll keep on keeping on, that I've got it right now, and at
17    the appropriate time you'll file a supplemental brief or
18    something and then blow them out of the water or they'll file
19    something and I'll say back to state court?
20              MR. NESLIN:  Yes, Your Honor.  If Your Honor were going
21    to provide for additional discovery before the resolution of
22    these issues, then we would submit that discovery should occur
23    here.  It shouldn't occur in state court.  You shouldn't grant
24    the remand motion on the expectation that --
25              THE COURT:  Because if at the end of the day they win
```

1    on the facts that it's not fraudulent joinder, it goes back

2    there, no harm, no foul, no harm, whatever.

3              MR. NESLIN:  Correct.

4              THE COURT:  On the other hand, if not, then it should

5    have been denied in the first place, and the only problem then

6    comes in -- as Mr. Aylstock says, well, what's getting ready to

7    happen, the great federal government is going to swoop down here

8    and bring it up to Pennsylvania in the meantime.

9              MR. NESLIN:  Your Honor, if I could respond to that,

10   I've heard that argument before.  I heard a plaintiff's attorney

11   refer to it as purgatory.  There's no way they could --

12             MR. AYLSTOCK:  We refer to it as the black hole.

13             MR. NESLIN:  And that's not the case, Your Honor.  I

14   can cite you a couple of -- in fact, two of the MDL decisions

15   that we attached to our remand or our opposition to remand

16   papers.

17             THE COURT:  Well, I'm not going to -- let me just

18   interject here.  And I'm not directing this to these lawyers

19   here, but the lawyers who do plaintiff work are getting ready to

20   fix it so you won't be able to do much in state court on a lot of

21   levels and I'll get to see them all, which I really don't want to

22   do and I don't think it's in the interest of the republic to do

23   that, but you can kill the goose that lays the golden egg, and

24   some of our colleagues, us attorneys, are doing just that.

25             MR. AYLSTOCK:  We're aware of that, Your Honor.  We're

1  doing everything we can to fight it.

2  MR. NESLIN:  My only purpose in raising this last

3  point, Your Honor, was to point out that the MDL Court has issued

4  decisions on fraudulent joinder in as few as a couple of days, a

5  couple of weeks, when the briefing is completed where a plaintiff

6  has asked for expedited consideration.  Two of those decisions

7  are attached to our opposition papers.

8  THE COURT:  What else do you want to say before you get

9  to read that?  Are you finished right now?  Do you want to read

10  that case?

11  Have you got anything else you want to say while he's

12  reading the case?

13  MR. AYLSTOCK:  Judge, I do, and I'd like to hand you a

14  deposition that I took just two days ago.  It was the first

15  deposition I was able to take of the Louisiana sales

16  representative.  This one is out of New Orleans.  It was done at

17  Ms. Manning's firm two days ago.

18  And I just handed it up to make clear one very

19  important thing; that is, what we're claiming here is not simply

20  that the sales representative failed -- had some duty to change

21  the package insert of the drug that they were detailing.  That's

22  not what we're claiming.

23  What we're claiming, in fact, is that the sales

24  representatives uniformly and as a policy went beyond or said

25  things contrary to package inserts so they could sell their drug

1  that they had a direct pecuniary interest in selling.  Their
2  bonuses were tied directly to the drug.
3          And just for way of background, Your Honor, these are
4  not simply clerks at a local Circle K or a gas station that sell
5  things.  These are highly-trained, highly-compensated people,
6  and, in fact, they have -- the drug industry spends seven billion
7  dollars a year on the sales representatives and they do it for
8  one reason, that is, that they sell drugs and they do it very
9  effectively.
10          One-on-one contact is how these drugs are sold, and
11  regardless of what's in a package insert, physicians do rely upon
12  what detail people say.  And as you'll see in Mr. Engar's
13  (phonetic) deposition, what he said was not in the package
14  insert.  In fact, it was off-label promotion.
15          And the last thing I'll hand to the Court is a similar
16  news story about Warner Lambert, another drug company, that in
17  fact had the exact same anything happen to it where it directed
18  its sales force to promote off label and it suffered criminal
19  fines and criminal violation for doing so.
20          And that's really what we're talking about here.  It's
21  not simply delivering a package insert.  A FedEx man can deliver
22  a package insert for a whole lot less than seven billion dollars
23  a year.  These are people that go visit with physicians.
24          To the extent there's any doubt about whether this drug
25  company promoted Pondimin, I'll hand up, first of all, the

1    affidavit of Dr. Eric Perham who is a sales representative in

2    another case who did the same affidavit that we're looking at

3    here, which says, again, basically I didn't do it.  I don't know

4    anything.  Also, Mr. Brazovski (phonetic).  And again --

5           THE COURT:  I've got say, Mr. Aylstock, you've given me

6    a bunch of stuff here that one took, regardless of the source,

7    and just from a cursory review of what you've given to me, given

8    to the clerk, would be making a case that the drug companies in

9    this country are a bunch of SOB's out for the buck.

10          Now, you don't have to tell me that that might be the

11   case, and you don't have to tell me they're paying seven billion

12   dollars to folks to go one-on-one with the doctor when God knows

13   what they're paying on advertisements to tell patients to call

14   their doctors to ask them about the drugs.

15          Their bottom line is they want to sell drugs, but I

16   don't really see this as the drug industry being on trial because

17   they're a bunch of SOB's.

18          MR. AYLSTOCK:  No.  My only point, Your Honor, was that

19   my claim was not simply that the sales reps failed to deliver the

20   warning that the drug company said.  My claim is, in fact, much

21   more than that, and that is that the drug representatives that we

22   have sued here did more than that in detailing off label and

23   prohibited uses for their drug in a way that caused doctors to

24   use the drugs.  For example --

25          THE COURT:  Now, these drugs -- the people who did this

1    to your client --

2              MR. AYLSTOCK:  Yes, Your Honor.

3              THE COURT:  What is it that you have that says that's

4    what those people did to these doctors who gave that to your

5    client?

6              MR. AYLSTOCK:  Nothing yet, Your Honor, because we

7    haven't had an opportunity to do the first lick of discovery

8    other than what's happened in every other deposition that I've

9    conducted, which is that they have admitted to that.

10             To the extent there's any doubt about whether this drug

11   company detailed Pondimin, you'll see I handed you up the

12   affidavits of the two sales reps who detail Dr. Duby (phonetic),

13   and Dr. Duby, in fact, testifies under oath that he detailed --

14   was detailed by those same representatives on Pondimin.

15             I'm using this, Your Honor, to directly refute the

16   allegation that was made -- and I guess there's been some

17   testimony -- that the drug company never detailed Pondimin.

18             The other thing that I would supply to the Court is

19   deposition testimony of Dr. Lisa Geonetto (phonetic) who, in

20   fact, is an expert for Wyeth, an obesity expert, and Dr. Geonetto

21   reaffirms in testimony, where she's an expert for Wyeth, that she

22   was detailed on Pondimin.

23             THE COURT:  Well, you know, I suppose, you know, when

24   you get the job I've got, you've got to think about a lot of

25   things, about how you see the world, and that is an evolutionary

1   process like anything for any of the rest of us.

2       But I've got to say, when I ask you what is it that you

3   have that says that's what the people did, these doctors who gave

4   that to your client, and you say, nothing yet, Your Honor,

5   because we haven't had an opportunity to do the first lick of

6   discovery other than what's happened in every other deposition

7   that I've conducted, which is that they have admitted to that,

8   I've got to tell you that being the case, the way I see the world

9   and whatever discretion they give me -- and if I'm erring, the

10  Fifth Circuit can fix it or Judge Bartle or whoever else can fix

11  it, but I've got to deny your motion to remand.  That's enough

12  right there.

13      Now, I'm going to look at this Fifth Circuit case to

14  see if there's anything that could come close to touching what I

15  just said.  That's the basis of my ruling; in candor to the

16  Court, what I asked you and you gave me the answer.

17      Now, it can't be, in my view, that our system works

18  that way, and the reason we have these multi-district litigations

19  is so we can hopefully resolve these things in some kind of sane

20  fashion if they do have common issues.

21      On a hope and a prayer is where you are in my view, and

22  I don't mean that disrespectfully.  Good lawyers go out there and

23  try to find who or whatever they find, but I do go back -- and

24  I'm not suggesting you or the lawyers in this case are doing

25  that, but we're getting ready to kill the goose that lays the

1   golden egg in some context not too far removed from this very

2   case.

3       I'm just saying legal theories about what may or may

4   not be, I can't in good conscience, as a federal district judge,

5   say I'm going to send you on back to state court because there's

6   a possibility. I find there's not much of a possibility, if any

7   possibility, under my perception of Louisiana law.

8       Now, could you show that Jane Doe who was the rep that

9   sold it to the doctor who prescribed it was sitting up there

10  lying to this doctor, so this doctor who administered whatever he

11  administered to Ms. Miller just threw all of his or her medical

12  education to the side and listened to this four-year college

13  graduate or five-year college graduate? I mean, I'm not willing

14  to go there.

15      And I'm saying enough that if I'm not understanding

16  your position, I hope the Fifth Circuit or Judge Bartle can fix

17  it, but I'm going to deny the motion for remand.

18      MR. AYLSTOCK: Judge, could I ask that we at least be

19  allowed to depose the sales representative in this case?

20      THE COURT: I am going to deny the motion to remand.

21  I'm going to suggest that -- we don't have a perfect system.

22  Like I told the poor fellow who just pled guilty who was

23  representing himself on a case that could be life imprisonment

24  and he pled guilty straight, pled in the blind today, it's not a

25  perfect system, but it's the best system, and I'm doing the best

1    I can certainly to maintain the process, because I believe -- I

2    know it to be true.  All we've got is the process.

3            And the process says you go to multi-district in my

4    view, and if I'm wrong, I hope I said too much for the legal

5    position I took so you can wrap it around my neck and get the

6    Fifth Circuit to jerk it back or get Judge Bartle to send it

7    right back.  Then I'll send it down to the state court from where

8    it was removed.

9            MR. AYLSTOCK:  May I ask you to reserve ruling until

10   you read the Fifth Circuit case?

11           THE COURT:  I think I said that, that I'm going to do

12   that, but, again, without having gone into any kind of detail

13   other than you talking about affidavits, I'm not sure what they

14   could have said.  And I've got to take it that this -- McKee is

15   the name of the case?

16           MR. AYLSTOCK:  McKee, yes.

17           THE COURT:  This is not a case with this defendant?

18           MR. AYLSTOCK:  It is not.  It is a case where an

19   affidavit was simply presented.

20           THE COURT:  I just want to -- like I'm saying, I can't

21   see -- and maybe it will.  Maybe it will knock me over.

22           And, of course, let me ask opposing counsel before I

23   read it -- and, Ms. Lundgren, you have our copy of the case and

24   you're starting to look at it right now.  You've read it now?

25           MR. NESLIN:  I've scanned it, Your Honor.

1       THE COURT:  And what's your view of that?  This is one

2   of those officer of the court questions that sometimes lawyers

3   say, oh, my God, don't put it that way.

4       MR. NESLIN:  No.  I accept it that way.

5       THE COURT:  But officer of the court question, your

6   view after your making a cursory review of it.  You probably

7   ought to get back to the mike so we can all hear you.  I'm

8   getting hard of hearing.

9       MR. NESLIN:  Certainly.  First, this doesn't change the

10  fact that the drug representatives had no obligation to do

11  anything more than pass along the warnings that they received

12  from Wyeth.  It doesn't address that issue.  It does not change

13  that part of the Westbrook decision or the state court decisions

14  I cited previously.

15      So it's not -- even if it said what plaintiff's counsel

16  would like it to say, it doesn't save their claim here.  It does

17  not say what plaintiff's counsel, I think, would like it to say.

18      Again, I've only just skimmed it, Your Honor, but it

19  really doesn't go beyond the Travis v. Irby decision that's cited

20  in our papers.  And it recognizes that courts can pierce the

21  pleadings.  One thing the court does say is the court must also

22  take into account all unchallenged factual allegations, including

23  those alleged in the complaint.

24      So what it seems to be saying is if there are factual

25  allegations in the complaint that have not been challenged or

1    rebutted by affirmative evidence, the Court can consider those.

2            Here any factual allegations in the complaint were

3    rebutted by affirmative evidence by the declaration of the sales

4    rep, Ms. Lege, and by the sworn testimony of the Wyeth officials.

5            MR. AYLSTOCK:  But not Mr. Simoneaux.

6            MR. NESLIN:  I don't believe you need a declaration

7    from Mr. Simoneaux.  You have sworn testimony from other Wyeth

8    officials talking about detailing practices and the fact that

9    sales reps did not detail Pondimin.  As I mentioned, Judge Bartle

10   at the MDL Court relied upon similar evidence in finding

11   fraudulent joinder in Pretrial Order 2886.

12           MR. AYLSTOCK:  And, Your Honor, we've rebutted the

13   allegation or the evidence that they didn't detail Pondimin with

14   specific affidavits that, in fact, they did and testimony from

15   Wyeth's own experts that she was detailing Pondimin.

16           MR. NESLIN:  But none of that evidence or testimony

17   goes to these detailers.  The issue for this Court is what these

18   two defendant detailers did, and the plaintiffs have submitted no

19   evidence on that issue.

20           THE COURT:  And, Mr. Aylstock, is it correct that Judge

21   Minaldi found that the duty owed by the sales rep is to deliver

22   and explain the drug package inserts to the physicians in their

23   territory?  Is that what she said?

24           MR. AYLSTOCK:  That is what she said, Your Honor.

25           THE COURT:  And in your complaint, do you say that

1  those drug reps violated that duty?

2  MR. AYLSTOCK:  The complaint, Your Honor, relative to

3  the sales representatives are found on Page 4 of the complaint.

4  First of all, we allege that they were committed in

5  their individual and/or corporate capacity.  And what we say is

6  that they -- we don't traverse that specifically, Your Honor, but

7  what we do say is that they went outside the package inserts, and

8  that by failing to convey the warnings in the package insert and,

9  in fact, by going outside of the package insert, that is what

10  we're talking about.

11  And just one thing else I'd like to present to the

12  Court.  That is simply that what I don't want to get in a

13  position of down the road, Your Honor, is a sales representative

14  doing -- saying that he or she did something that, in fact, was

15  against the product label.

16  And in this case I'm presenting the Court with a note

17  from an actual sales representative where she's saying that the

18  PPH, which is a deadly disease, is just the bogeyman and not to

19  worry about what's in the product label, because the product

20  label did have PPH.  There in the top right.  I'm sorry, Your

21  Honor.  And PPH is just the bogeyman, so don't worry about it.

22  And, in fact, I propounded discovery specific to this

23  very note and asked Wyeth what their position was on whether that

24  sales representative note would be ultra vires, an ultra vires

25  act, and whether the sales representative was acting in the

1   course and scope of their employment.

2          And, of course, they deny that, and that's exactly what

3   would happen in this case if we're allowed to do the discovery.

4   If we prove what we've alleged, that they acted outside the

5   bounds of the package insert, Wyeth is simply going to come in

6   and say that's not our fault.  We trained them just to talk about

7   the package insert.

8          And the analogy that I'd like to draw -- and what I

9   would submit McKee requires -- is that this Court put itself in

10  the shoes of the state court in looking at the complaint.

11         If there was only a claim against the sales

12  representative defendants in this case and we had made these

13  allegations, would the state court permit us discovery to prove

14  our allegations or would there simply be a motion to dismiss

15  granted?  I would submit that a state court in Louisiana would

16  allow us to prove what we've alleged, and that's all that we're

17  asking in this case is for --

18         THE COURT:  What was the basis for the allegations if

19  what you told me a while ago is that we haven't done a lick of

20  discovery?  What was the basis of the allegations if that's what

21  the rep in this case told the doctor that prescribed it to

22  Ms. Miller?

23         MR. AYLSTOCK:  Well, what we said in this case is that

24  they failed to adequately warn of the product, and the basis --

25         THE COURT:  What was the basis of that, the good faith,

1    reasonable investigation you made that said these two reps to the

2    doctor or doctors that was involved with Ms. Miller did in fact

3    go outside what they should have done, outside the information

4    with the drug?

5        MR. AYLSTOCK:  What we have, Your Honor -- and I have

6    it out in the truck.  We can pull it out if we need to.  But what

7    we have are many documents relative to the sales force including

8    sales force surveys where doctors were reporting what sales reps

9    told them, what sales reps were reporting.

10       THE COURT:  Time out.  I'm talking about this plaintiff

11   with these two Louisiana defendants, who I've just said that I

12   don't think there's a reasonable possibility, other than you have

13   some statistical information from whatever source that you think

14   must be or might be applicable to these two sales reps who are

15   Louisiana defendants.

16       MR. AYLSTOCK:  The answer is we know these sales

17   representative defendants did not warn about valvular heart

18   disease because the physician has said that they didn't warn

19   about valvular heart disease.  And we know also --

20       THE COURT:  What did they go outside and say outside

21   the packet information?  What did they go outside and say to

22   these doctors that caused these doctors to not warn your client

23   or prescribe something they shouldn't have prescribed to your

24   client?

25       MR. AYLSTOCK:  They deliberately downplayed the PPH

1    warning.   And, Your Honor --

2              THE COURT:  Who deliberately did that?

3              MR. AYLSTOCK:  The sales representative.

4              THE COURT:  In this case?

5              MR. AYLSTOCK:  That's my position, Your Honor.

6              THE COURT:  What's your basis for saying that?

7              MR. AYLSTOCK:  The basis is memos from the company to

8    the sales force saying to do that.

9              THE COURT:  To the sales force, to these two reps?

10             MR. AYLSTOCK:  Not specific to these two reps, Your

11   Honor, but I have directives from the company, please downplay,

12   don't bring up PPH.  If you do, make sure you de-emphasize it.

13   Let's not bring it up at all.  And I do not have anything, Your

14   Honor, quite candidly, saying Mr. Simoneaux or Ms. Lege don't do

15   that.

16             THE COURT: All right.  Yes, sir.

17             MR. NESLIN:  I was simply going to point out, this is

18   not a PPH case.  We're very far afield here.  Mr. Aylstock is all

19   over the landscape.  PPH is a separate injury that some diet drug

20   plaintiffs have alleged.  It's a very serious injury.  There is

21   no PPH claim in this case.  He's trying to bring in some kind of

22   -- who knows what it is, but it has no relevance here.

23             He's submitting to the Court documents -- just glancing

24   at the documents that he was throwing onto our table captioned

25   Bogey M.  It appears to be some description of detailer action,

1    but it's referring to Redux.  There's no dispute here that the

2    detailers detailed Redux.  That's a different drug.

3              The problem here is that plaintiffs allege that they

4    were injured by Pondimin.  The detailers and other Wyeth

5    officials have testified detailers didn't detail Pondimin.  He

6    has no evidence to rebut that that's specific to this case.

7              And I've looked at the petition, and I'd invite

8    Mr. Aylstock to correct me, but looking at the allegations

9    regarding the sales representative defendants, there is no

10   allegation that they failed to forward the diet drug warnings

11   that they received from Wyeth.  The allegations are that those

12   warnings were insufficient.

13             The allegations -- I'll just quote one.  Sales

14   representative defendants failed to convey adequate warnings to

15   the plaintiffs through the prescribing physicians.  Sales

16   representative defendants negligently distributed, marketed,

17   advertised, or promoted the drug Redux or Pondimin.  They made

18   negligent misrepresentation.

19             These are arguments about the sufficiency of the

20   package insert and the warning that Wyeth provided.  That may be

21   sufficient to create a cause of action against Wyeth.  It doesn't

22   create any cause of action against the detailers here.

23             THE COURT:  All right.  I'm going to look at that Fifth

24   Circuit case right quickly.  We'll just all stay in court here.

25                          (PAUSE)

1    THE COURT:  All right.  For the record, I have reviewed
2    the case that plaintiff's counsel pointed out to the Court.
3    That's McKee vs. Kansas City Southern Railway Company that was
4    decided January 23rd, 2004.
5        And you indicated, Mr. Aylstock, it was after Judge
6    Minaldi's decision?
7        MR. AYLSTOCK:  No.  I think I confused the magistrate
8    judge.  There was a report and recommendation.
9        THE COURT:  Yeah.  Because Judge Minaldi's decision was
10   February 2nd, 2004.
11       MR. AYLSTOCK:  Okay.  My apologies if I made that
12   representation.
13       THE COURT:  And that notwithstanding, there's nothing
14   in McKee that changes my earlier statement.  I'm going to deny
15   the remand, and I find that under the duty as found by Judge
16   Minaldi, which would lead to be the law in this state -- I'm not
17   sure how Alabama is doing it differently if they've got the same
18   law, but that under the duty and obligation of the pharmaceutical
19   sales representative to deliver and explain the package inserts
20   to the physicians and their territory, that there's no reasonable
21   possible recovery against the sales representative.
22       I appreciate the candor that plaintiff's counsel has
23   demonstrated, which is what's owed to the Court in response to my
24   direct question about what they have and what they don't have.
25   And I will say this, that I have complete faith, even though this

1    may have been referred to purgatory or the black hole, whatever,

2    that in due course justice will be had, and those folks who have

3    real claims against parties that have been made part to this

4    litigation, including sales reps, if I'm wrong, they will --

5    there will be a way to redress that in the federal system.

6         And that's no disrespect to the state court system.  I

7    have no doubt that it will be handled so that in our search for

8    the truth in this case, the truth will be ascertained.

9         Now, I'm going to -- based on that ruling, I'm going to

10   go ahead and enter a stay in this proceeding.  And I don't know

11   how long it's going to be before anything happens.  And I'd ask

12   defense counsel -- again, I see these all the time, and

13   plaintiff's counsel might see them all the time, too, but I think

14   you'd have a better feel for it.

15        Where are we going to be like a month from now?

16        MR. NESLIN:  My co-counsel has advised me there is a

17   hearing in September before the JPML.

18        MS. MANNING:  We're not sure, Judge, whether this case

19   is on a conditional transfer order or not.  We can find that out

20   and let you know.  But as soon as it's put on a conditional

21   transfer order, it goes onto the docket at the very next hearing

22   at the JPML and they meet pretty much every other month.  So it

23   would move to Philadelphia in about three months maybe.

24        THE COURT:  Well, what I'm going to ask you to do --

25   I'm going to administratively terminate this case in this court.

1   I'm going to allow the lawyers, plaintiff or defendant, within 30

2   days of whatever action the Court in Pennsylvania takes, to file

3   a motion to reopen it.  It would be great if you've got a joint

4   motion, but maybe it won't be that kind of posture.

5        And then if it's still here after whatever they do in

6   Philadelphia, we'll just go ahead and do what we've got to do

7   over here.  And if it's not here, I want to know -- I'm going to

8   put it on the defense lawyers to let me know after it's resolved

9   in the multi-district litigation within 30 days.

10        And, again, in a perfect world, maybe we don't even

11  have to think about these things, but it seems real clear to me

12  this is the right thing to do even if in my heart it's not what I

13  want to do.  But under the law, I think it's the right thing to

14  do as I appreciate the law.

15        So with that -- and, again, if there's any way you guys

16  can rock and roll and get some group of judges that say, boy, he

17  screwed it up, again, I wouldn't be offended at all.

18        So, at any rate, thank you all for being here.  And we

19  are in recess.

20                          --   --   --

21

22

23

24

25

40

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE-OPELOUSAS DIVISION

MARILYN LEE, ET AL.                    :

VS.                                    :    DOCKET NUMBER 04-1103

WYETH, ET AL.                          :

CERTIFICATE OF REPORTER

    I, LaRae E. Bourque, Official Court Reporter for the United States District Court, Western District of Louisiana, do hereby certify that the foregoing 39 pages are a true and accurate transcript of the proceedings had in this matter, as hereabove set forth, and that I have no interest of any nature whatsoever regarding the ultimate disposition of this litigation.

    I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

LARAE E. BOURQUE, RPR, CRR
Official Court Reporter

# EXHIBIT F

U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
F I L E D

**NOV 1 6 2004**

ROBERT H. SHEMWELL, CLERK
BY_____
                    DEPUTY

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### LAKE CHARLES DIVISION

PRINTESS RICHARD                    :        DOCKET NO. 2:04 CV 1582

VS.                                 :        JUDGE MINALDI

WYETH, ET AL.                       :        MAGISTRATE JUDGE WILSON

### JUDGMENT

In accordance with the corresponding Memorandum Ruling, for the reasons set forth therein, and after a *de novo* determination of the issues, having considered the objections filed herein,

IT IS ORDERED that the plaintiff's Motion to Remand [doc. 9] IS DENIED.

Lake Charles, Louisiana, this _/5_ day of November, 2004.


PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE

U. S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
FILED

NOV 1 6 2004

ROBERT H. SHEMWELL, CLERK
BY_____ DEPUTY

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### LAKE CHARLES DIVISION

PRINTESS RICHARD :  DOCKET NO. 2:04 CV 1582

VS. :  JUDGE MINALDI

WYETH, ET AL. :  MAGISTRATE JUDGE WILSON

## MEMORANDUM RULING

Presently before the court is the plaintiff's Motion to Remand [doc. 9]. The remand has been opposed by the defendants. The Magistrate Judge prepared a Report and Recommendation in which he recommends remand. The defendants have filed an objection to the Report and Recommendation.

Wyeth submits that remand should be denied because the only non-diverse defendants in this case, two Wyeth sales representatives, Angelle Lege and Michael Wicks, and Louisiana Wholesale Drug Company, Inc. were fraudulently joined. The Magistrate Judge found that Louisiana Wholesale and Michael Wicks were fraudulently joined. The remaining issue is whether or not Angelle Lege was fraudulently joined. The Magistrate Judge found that she was not and it is this finding to which Wyeth objects.

The determination that Angelle Lege was not fraudulently joined was based upon Magistrate Judge Wilson's conclusion that Dr. Biddle's affidavit created a factual question as to whether Ms. Lege made actionable statements outside the information provided in the FDA approved package insert for Pondimin or Redux. The plaintiff was not a patient of Dr. Biddle, but was allegedly prescribed Pondimin by Dr. John Caire. This court agrees with Wyeth that, even assuming Ms. Lege

made the statements alleged in Dr. Biddle's affidavit, and even assuming Ms. Lege made these statements to the plaintiff's treating physician, such statements do not create a viable cause of action.

In making this determination, the court notes that the plaintiff has submitted no evidence that can refute both Mr. Wicks's and Ms. Lege's sworn statements that they were unaware of any danger of VHD associated with diet drugs.[1]  Ms. Lege could not have misrepresented a danger about which she had no knowledge.  Additionally, there is no evidence that the statements allegedly made by Ms. Lege to Dr. Biddle were made to the plaintiff's treating physician.

More importantly, the physician had the product insert that had been approved by the FDA. It would be unreasonable for a physician to ignore the information provided by the drug company and approved by the FDA in favor of contrary information provided by a sales representative.[2] Because all of Dr. Biddle's statements are either true, are restatements of the package insert, or are inconsistent with the package insert, they are not actionable.

It has been established that, in the case of prescription drugs, the manufacturer has no obligation

---

[1] The plaintiff claims that she suffers from VHD.

[2] A health-care provider's deviation from a manufacturer's warning may be negligence for which expert testimony is not required to establish the applicable standard of care, because such evidence may be sufficient to make a prima facie showing of negligence. *See Fournet v. Roule-Graham*, 00-1653 (La.App. 5 Cir. 3/14/02), 783 So.2d 439, *writ denied*, 01-985 (La.6/15/02), 793 So.2d 1242; *Terrebonne v. Floyd*, 99-766 (La.App. 1 Cir. 5/23/00), 767 So.2d 758, *writ not considered*, 00-1931 (La.9/29/00), 769 So.2d 549; *Christiana v. Sudderth*, 841 So.2d 911, 916, 02-1080 , **9 (La.App. 5 Cir., 2003).

2

to warn a consumer of that drug so long as the prescribing physician has been adequately warned of any potentially adverse side effects. *Givens v. Lederle*, 556 F.2d 1341, 1345 (5th Cir. 1977); *Reyes v. Wyeth Laboratories*, 498 F.2d 1264, 1276 (5th Cir. 1974); *Davis v. Wyeth Laboratories*, 399 F.2d 121, 130 (9th Cir. 1968); *cf. Heirs of Fruge v. Blood Services*, 365 F.Supp. 1344, 1350 (W.D.La.1973), modified on other grounds, 506 F.2d 841 (5th Cir. 1975). The prescribing physician acts as a "learned intermediary" between the manufacturer and the consumer, since he is in the best position to weigh the benefits against the risks of a particular drug therapy. *Reyes v. Wyeth Laboratories*, supra, 498 F.2d at 1276; see Merrill, Compensating for Prescription Drug Injuries, 59 Va.L.R. 1, 91 (1973); Timm v. Upjohn Co. 624 F.2d 536, 538 (C.A.La., 1980). As a medical expert, the prescribing physician must take into account the propensities of the drug, as well as the susceptibilities of his patient. His is the task of weighing the benefits of any medication against its potential dangers. The choice he makes is an informed one, an individualized medical judgment bottomed on a knowledge of both patient and palliative. The distributor of a prescription drug must provide adequate information to the prescribing physician for it is the physician who bears the ultimate responsibility for dispensing the drug. See D. A. Kessler, supra, at 742, 747; H. A. Toulmin, Jr., A Treatise on the Law of Foods, Drugs & Cosmetics s 24.12 at 576 (2d ed. 1963).

Therefore, after considering the law and the arguments of counsel, remand will be denied on the basis of fraudulent joinder.

Lake Charles, Louisiana, this 15 day of November, 2004.

PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE

3